IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:20-cr-00011 |
| | ) | |
| AGUSTIN ALBERTO LAINEZ | ) | |
| | ) | |

### UNITED STATES' SENTENCING MEMORANDUM

Agustin Lainez terrorized his victim.  Day after day, hour after hour, message after message, he harassed the victim through abusive language, extortion, and violent threats.  Lainez did not transform his behavior into physical actions, but the trauma of his words have harmed and scarred the victim nonetheless.  As the victim says in her impact statement, the defendant made her feel "like [her] life was over."

The Presentence Investigation Report ("PSR") outlines the defendant's sentencing exposure.  Having pled guilty to one count of Cyberstalking, pursuant to 18 U.S.C. § 2261A(2)(B), the U.S. Sentencing Guidelines suggest a sentence of 24 to 30 months' imprisonment and a term of supervised release of one to three years.  PSR, ECF No. 39, at ¶¶ 53, 56.  However, under Rule 11(c)(1)(C), the parties have agreed to a sentencing range of 12 to 18 months' incarceration and at least two years of supervised release in recognition of the defendant's early plea and to avoid the trauma of having the victim testify in court and face her abuser.  *See* PSR, ¶ 9.  In compliance with this agreement, the United States recommends at sentence of incarceration at the low-end of the applicable range, and three years of supervised release, which is necessary so that the defendant's behavior can be monitored and so that he can receive the

services essential for him not to repeat this offense with another woman.   For these and other reasons, as detailed more fully herein, the United States respectfully submits that its recommended sentence is appropriate and would be reasonable and satisfy the Section 3553(a) factors.

## FACTUAL BACKGROUND

G.U. is a student at a college in the Western District of Virginia.   She is also an online gamer on a website called Twitch.   Twitch is a video live streaming service operated by Twitch Interactive, a subsidiary of Amazon.   G.U. earns income from having others watch her playing online games, and, as part of this online gaming community, she has an anonymous identity, which helps protect her from online harassment.   In other words, online she is known only by her gaming nickname and Twitter handle and not her real name for reasons that are important to her.

In approximately September 2019, G.U. met Augustin LAINEZ on Twitch, where he is known as "AJ" and by his Twitter handle.   After meeting online, G.U. and LAINZ became friends and would talk after playing online video games together.   One of the primary ways G.U. and LAINEZ "talked" was through Twitter Direct Messages ("DM"). Twitter DMs are a way for users to engage in private communications with one another through their respective Twitter accounts, similar to text messaging.

According to G.U. and as is reflected in the Twitter DMs between the victim and LAINEZ, in and around December 2019, LAINEZ became possessive of G.U., such as questioning her about her relationships with other men and getting angry at her for these relationships.   When G.U. learned that LAINEZ liked her as more than a friend (apparently, he told a mutual friend that he wanted to marry her), G.U. informed LAINEZ that she did not feel

the same way about him, in part because she had not met him in person.

In January 2020, LAINEZ requested a nude photograph of G.U.   She initially demurred, but relented when he became angry and started calling her names.   G.U. believed that LAINEZ would leave her alone after she sent him the photo.   This was the start of LAINEZ's aggressive and bullying behavior, which only escalated over time.

A couple of weeks later, LAINEZ asked if G.U. would have a sexual relationship with him.   Rejected romantically and believing that G.U. was lying to him (as reflected in his Twitter DMs), LAINEZ informed G.U. that the only way he could "move on" was if G.U. had sexual intercourse with him: "I just wanna say I won't ever forget but I'll be able to move on and still be friends but only way that'll happen is you have to fuck me now."   LAINEZ texted this Twitter DM on February 21, 2020 at 2:10 a.m.   Fifteen minutes later, at 2:25 a.m., LAINEZ increased his demand to include a video, at least a minute long "that shows everything especially the things I haven't seen your (vagina/ass)."   When G.U. balked at sending the video, LAINEZ became angry: "I meant what I said and now you're actually pissing me off send the video last time I ask."   LAINEZ sent this Twitter DM on February 21, 2020 at 8:53 a.m., just six hours after his initial demand.   When G.U. again balked at sending the video, LAINEZ sent a text at 10:33 a.m. saying "just fucking do it what's your problem no way you're this dumb and would rather get exposed?"   Later, on February 21, 2020 at 3:03 P.M., LAINEZ gave G.U. an ultimatum to send the video of her naked by 9 p.m. or "you know what happens."   The rapid escalation of LAINEZ's abusive behavior over mere hours in a single day is alarming and astonishing.

When threats to publicly disclose information about G.U. did not compel her to

immediately send a naked video of herself, LAINEZ resorted to threats of physical harm.   At 8:00 p.m. on February 21, 2020, LAINEZ sent a Twitter DM to G.U. showing her a screenshot of a public Twitter post/tweet to two other Twitter accounts.   In the post, LAINEZ asked the two individuals to "please beat [her] ass next event y'all are at together I'll let you know which one [she] goes to and more than enough incentive to act one [sic] it."   Four minutes later, LAINEZ sent G.U. a second screenshot, this time of what appears to be a cellphone "Notes" page that included G.U.'s real name, high school, city of residence, university, telephone number, and a list of people, according to LAINEZ, that G.U. had "shit talked/exposed behind their back, with screenshot proof." Along with the screenshot, LAINEZ sent the message: "On my draft ready go go [sic] and I'm adding more…"   In less than 24 hours, LAINEZ had transformed into an extortionist when G.U. did not comply with his wildly inappropriate request. Fearful that LAINEZ would follow through with his threats, G.U. sent LAINEZ a video of herself naked, as he demanded.   She would not have done so absent his threats.

Based on her communications with LAINEZ, G.U. believes that the threat of "exposure" meant, among other things, (a) disclosing to other Twitter users the nude photo G.U. had previously sent LAINEZ; (b) disclosing G.U.'s true identity and personal information to other Twitter users, who could then use the information to harass and/or locate G.U.; (c) disclosing to other Twitter users information that G.U. had told LAINEZ in confidence about other members of the online gaming community, including potentially embarrassing information about members engaging in infidelity while traveling.   Public disclosure of such information could cause a multitude of problems for G.U., including the loss of reputation and income. For instance, G.U.'s online gaming persona is essentially an alias. Should LAINEZ expose her true

identity, G.U. believes it may lead to harassment of her by other individuals who follow her on the internet and currently only know G.U. by her online alias. Additionally, should LAINEZ disclose the information G.U. told him in confidence, G.U. fears it could result in a loss of reputation and online followers who watch her streaming activity, which would consequently lead to a loss in revenue.  At some point, LAINEZ created another Twitter account called @gamercommunitea, which he kept private and which he filled with personal information about G.U.    LAINEZ threatened to make the account public.

Despite G.U.'s compliance with LAINEZ's extortion demand, his abusive behavior continued.  The next day, on February 22, 2020, LAINEZ demanded that G.U. answer questions from him.  When G.U. did not, LAINEZ accused G.U. of lying and demanded that G.U. take a pledge that read, "Aj I promise you to never lie to you again in my life and if I do, you have the right to expose everything you have on me and make my life miserable in any and every way you possible [sic] can."  When G.U. did not immediately make this pledge, on February 23, 2020, LAINEZ told G.U. that she "deserved to get exposed and beat [sic] and blackmailed for the rest of your life for your lies and whore ways . . ."  LAINEZ then threatened to rape G.U.:

> [Y]ou know what I have on you and you don't even know all the things I could be able to do with that information so you know what you have to lose that's why I'm not even going to bother and just make my demands and tell you what I want, when we fuck at an event this summer . . . I'm going to fuck you all 2-3 days/weekend we're at the event and I'm going to fuck you as many times as I want and do whatever I want and i don't want to hear a word or sound unless it's you moaning Ik [I know] you've mentioned you don't like anal or feet stuff too bad tho because if I want to stick it in your ass I will if I want to suck on your toes I will and everytime you lie to me I'll keep adding up stuff.

This threat is horrific – not only for its incredible level of violence but also because, at the time LAINEZ made the threat, he knew the victim had previously been sexually assaulted.   He intentionally and spitefully played on her worst fear.   When G.U. informed LAINEZ that she did not want to engage in sexual intercourse with him, LAINEZ responded that he would "have to make sure it happens."

Let's be clear:   LAINEZ was fully aware of his criminal conduct and the harm he was causing – and he reveled in it.   In his Twitter DMs during that day (i.e., February 23, 2020), LAINEZ repeatedly admitted that he was extorting G.U.   For example, at 3:12 p.m., LAINEZ stated that he was going to "keep Blackmailing you and adding things for you to do whenever you lie or I think you're lying to me."   Five minutes later, LAINEZ again confirmed his extortion: "[S]o if you want to never have to worry about getting blackmailed by me . . ."   The next day, February 24, 2020, LAINEZ again admitted his extortion:   "Lowkey hate this **and like it at the same time**, I just wish I didn't have to literally blackmail you for you to tell me the truth and not be a whore **lol**."[1]  (emphasis added)

LAINEZ threats of violence continued to escalate.   On February 25, 2020, when G.U. again balked at sharing information about herself with LAINEZ, he sent G.U. a screenshot. The screenshot was a text message to an individual in which LAINEZ offered to pay the individual and the individual's boyfriend "$500 each" to beat up G.U. because, as LAINEZ told G.U., she "need[ed] to know I'm not bluffing . . . So do you know I'm being serious now?" After sharing the screenshot, LAINEZ told G.U. that if she broke her promise, he would not be the "only person that'll be ruining your life."   Over the next few days, LAINEZ kept threatening

---

[1]        "LOL" means "laugh out loud," implying that he was enjoying his threats to her.

to "bring physical pain" and "ruin" G.U.'s life in order to compel her to keep communicating with him.

Interspersed with his communications attempting to extort a video from G.U. and threatening to rape her, LAINEZ sent angry and abusive Twitter DMs, including calling the G.U. names like "compulsive liar," "cockroach," "retarded," and "dumb," and repeatedly calling her a "whore."

Over time, the messages have escalated in intensity and directness.   For example, on March 16, 2020, at 6:44 PM, LAINEZ sent, in part, the following message to G.U.: "IF YOU BREAK MY PROMISE/HAVE BROKEN IT NOT ONLY WILL I DO EVERYTHING IVE SAID AND MAKE YOUR LIVE UNLIVABLE BUT I WILL…FUCKING HURT YOU NOW and I'm not talking mentally anymore but PHYSICALLY…"   As the victim details in her victim impact statements, the threats never stopped, including, at one point, harming her and her dog and causing the victim to fear for herself and her family:

> I lived in a constant state of fear for months. I felt horrible . . . I felt like he was always going to be harassing me until he got his way with me. He made me snap chat him multiple times a day so I literally could not leave my house just in case he asked for proof that I was home. He even threatened to kill my dog, which is one of the best things in my life. I was afraid he was going to come to my house one day with a gun or another weapon. I was scared for my dog and family. To this day I am still anxious about when he might get out in case he ever tries to come near me or my family.

LAINEZ continued to issue threats and demands for responses to G.U. for weeks – and did not care whether she was in class, asleep, or even able to respond.   LAINEZ's hate was daily and unrelenting, and so taxing on G.U. that she lived in constant fear, resulting, at one point, in a panic attack, PTSD, and ongoing trauma.   G.U. was so scared of LAINEZ that she

continued to respond to him out of fear of what he would do if she did not.   No one should be made to live like this.

## DISCUSSION

District courts generally must perform the following four steps in sentencing defendants: (1) "properly calculate the sentence range recommended by" the advisory Guidelines; (2) "determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if [it does] not, select a sentence that does serve those factors;" (3) implement any applicable mandatory statutory limitations; and (4) articulate, on the record, "the reasons for selecting the particular sentence" and especially, if applicable, "explain[] why a sentence outside of the Sentencing Guidelines range better serves the relevant sentencing purposes set forth in § 3553(a)" than one within it.   *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); 18 U.S.C. § 3553(a).   This memorandum outlines these factors and the bases for the United States' recommended sentence.

### A.  Section 3553(a) Sentencing Factors

**i.       The Nature and Circumstances of the Offense and the History and
         Characteristics of the Defendant**

The nature of the defendant's conduct should not be minimized because it took place on the internet.   Although the victim was never physically harmed, the defendant's criminal acts were still traumatizing.   The defendant's threats of violence – including repeated rape – are heinous, and caused the victim to live in fear every day for weeks until his arrest, which the defendant recognizes by pleading guilty to Cyberstalking, a crime that requires proof of a pattern of conduct and a resultant emotional or physical harm on a victim. The effect of this crime on the victim has

manifested itself physically and has required her to seek mental health counseling – harms no less significant than physical abuse.

Nothing in the defendant's background or history excuses or explains his abusive conduct. The defendant acknowledges that he had a good childhood, never experienced abuse or neglect, and has a supportive family.   PSR, ¶ 44.   He does not struggle with a substance abuse addiction. *Id.*, ¶ 48.   Although the defendant has been anxious because his father wants him to work and he refuses to do (PSR, ¶ 47), this does not merit any reduced sentence.   *See* U.S.S.G. § 5H1.3 (rejecting downward departure for mental and emotional conditions unless manifested to "unusual degree").   Conversely, the defendant has no prior criminal arrests or convictions and the defendant pled guilty early, preventing the victim from having to testify at trial and confront her abuser.

For these reasons, the United States believes the Rule 11(c)(1)(C) range is appropriate.

**ii.      The Need to Avoid Unwarranted Sentencing Disparities**

The United States' sentencing allocution does not create a sentencing disparity.   Section 3553(a)(6) asks the Court to consider the sentences of similarly situated defendants when determining its sentence.   According to data from the U.S. Sentencing Commission for the Fourth Circuit, in 2019, over 90 percent of "stalking/harassing" offenders received a prison-only sentence, with the median sentence length of 28 months.   Statistical Information Packet, Fiscal Year 2019, at Tables 5, 7, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/4c19.pdf (last accessed on Dec. 10, 2020).   This means that the Rule 11(c)(1)(C) range represents a significant benefit to the defendant, and that the United States' request for 12 months' incarceration and 3 years' supervised release is not out of line with the sentences of other defendants generally.

9

iii.    **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, Provide Just Punishment, and Provide Adequate Deterrence**

For the reasons articulated above, this Section 3553(a) factor also weighs in favor of a period of incarceration and, more importantly, an extended period of supervised release.   The defendant's threats of violence caused trauma and harm.   A sentencing containing a period of incarceration is appropriate to deter adequately not only this defendant, but to send a message in the community that criminal abuse on the internet will not be tolerated by this Court.

iv.    **The Need for the Sentence to Provide the Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment In the Most Effective Manner**

There is something at issue with the defendant for him to so rapidly and violently threaten the victim, and to do so over and over again -- and, in his own words, "like it."   Because of the nature of the offense and the defendant's actions, the United States requests mandatory mental health counseling while in prison and as one of the defendant's supervised release conditions.

v.    **Applicable Sentencing Range and Kinds of Sentences Available**

The PSR details the Guideline calculation.   PSR, ¶¶ 28-37, 52-53, 55-56, 58-65.   The suggested sentencing range is superseded by the Rule 11(c)(1)(C) agreed sentence of a period of incarceration from 12-18 months, at least 2 years of supervised release, and mandatory restitution. PSR, ¶ 9.

Because of the nature of these offenses, the United States asks for an extended period of supervised release.   In the plea agreement, the defendant agrees to serve a period of "not less than 2 years," so this request is compliant with the agreement between the parties.   As conditions of his supervised release, the United States requests that the defendant (1) not contact the victim,

G.U., either directly or indirectly, and including but not limited to commenting, posting, or responding to any of her social media accounts;[2] (2) participate in regular mental health treatment, including anger management classes; and (3) not use or access social media in any form, including Twitch.   The sentence needs to not only protect this victim but also protect other potential victims in the community.

### vi.    Pertinent Policy Statement

Pertinent policies are cited in the memorandum.

### vii.    Restitution

The defendant is required to pay full restitution by statute and per the plea agreement.   18 U.S.C. § 3663A; PSR, ¶¶ 64-65.   To date, the United States is only aware of $20 in restitution and has provided that receipt to probation and defense counsel.

### viii.    Sentencing Exhibits and Testimony

The United States does not intend to present any additional evidence at the sentencing hearing, unless it is required to do so to rebut any arguments or evidence raised by the defendant. The victim has submitted a victim's impact statement to be read at the hearing and may also choose to speak at the hearing.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 12 months' imprisonment, 3 years of supervised release, and the payment of restitution.

Respectfully submitted,

---

2        The defendant agreed to this condition as part of the plea agreement.

DANIEL P. BUBAR
Acting United States Attorney

s/Heather L. Carlton
Heather L. Carlton
Assistant United States Attorneys
United States Attorney's Office
255 West Main Street, Room 130
Charlottesville, VA 22902
Tel:      434.293.4283
Heather.carlton@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been electronically filed with the Clerk by CM/ECF system which will send notification of such filing to counsel for the defendant, on this 11th day of December 2020.

s/Heather L. Carlton
Assistant United States Attorney